UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN MUNNELLY,

                  Plaintiff,

        -against-

FORDHAM UNIVERSITY FACULTY AND
ADMINISTRATION HMO INSURANCE
PLAN; EMPIRE HEALTHCHOICE
ASSURANCE, INC., and
UNITEDHEALTHCARE INSURANCE
COMPANY OF NEW YORK,

                  Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 30 18

**MEMORANDUM**
**OPINION & ORDER**

16 Civ. 5632 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Kevin Munnelly brings this action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, challenging Defendants' denial of

mental health benefits for residential treatment services provided to his 17-year old son, "C.M."

(See Cmplt. (Dkt. No. 1) ¶¶ 1-3, 12)[1] Plaintiff's only remaining claims are against Empire

HealthChoice Assurance, Inc. ("Empire"), the claims administrator for Plaintiff's group health

plan. (See id. ¶ 8)[2]

        Plaintiff has moved for summary judgment, arguing that Empire's denial of

C.M.'s claim for mental health benefits was erroneous, because it was based solely on the Plan's

---

[1] Except as to the parties' briefs and the administrative record, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system. Citations to the parties' briefs, March 19, 2018 supplemental letter briefs, and the administrative record are to the pages and/or Bates stamp numbers in those documents.
[2] Plaintiff voluntarily dismissed his claims against the Fordham University Faculty and Administration HMO Insurance Plan and UnitedHealthcare Insurance Company of New York. (Dkt. Nos. 52, 55, 71)

residential treatment services exclusion without consideration of applicable federal and New York law. (Mot. (Dkt. No. 57)) According to Plaintiff, Empire's residential treatment services exclusion constitutes a separate treatment limitation that applies only to mental health benefits, and therefore violates the Mental Health Parity and Addiction Equity Act (the "Parity Act") and the New York Parity Law (also known as "Timothy's Law"). (See Pltf. Br. (Dkt. No. 57-1) at 1) Plaintiff asks this Court to order Empire to grant his claim for mental health benefits. (See Mot. (Dkt. No. 57); Pltf. Br. (Dkt. No. 57-1) at 2)

Empire has cross-moved for summary judgment, arguing that it did not abuse its discretion in denying Plaintiff's claim for mental health benefits because (1) the Plan expressly excludes coverage for residential treatment services; (2) Plaintiff did not comply with the Plan's pre-certification requirement; (3) the Plan expressly excludes treatment for out-of-network inpatient mental health care treatment; (4) the Plan complied with the Parity Act; and (5) Plaintiff's attempts to invoke the New York Parity Law fail. (See Mot. (Dkt. No. 56); Def. Br. (Dkt. No. 59))

## BACKGROUND[3]

Plaintiff Kevin Munnelly is employed by Fordham University. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶¶ 1-2) In 2014, Plaintiff and his dependents – including C.M. –

---

[3] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 Statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where a party opposing a motion disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the adversary's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by this Court are undisputed.

received health coverage issued by Empire, under group name Fordham University Local 153's

health benefits plan (the "Plan"). (Id. ¶ 3; Genovese Decl., Ex. C (Administrative Record) (Dkt.

No. 58-3) at 000001, 000125, 000141-43) The Plan was in effect for "the period commencing on

January 1, 2014 and ending on December 31, 2014." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1)

¶ 5) At all relevant times, Empire was the plan administrator as defined by 29 U.S.C. § 1002(16)

of ERISA. (Id. ¶ 4)

It is undisputed that the Plan provides mental health benefits. (Pltf. R. 56.1 Stmt.

(Dkt. No. 57-2) ¶ 3; Def. R. 56.1 Counterstmt. (Dkt. No. 63) ¶ 3)

## I.    THE PLAN

### A.    Overview and Relevant Definitions

Article I of the Plan contains relevant definitions, including the following:

In this Contract, "we," "us," "our" and "the Plan" refer to Empire HealthChoice, Inc.
"You," "your" and "yours" refer to the Covered Member. "Group" refers to the Group
that buys this Contract. Employees or members who are covered under this Contract . . .
are referred to as "Members." Members and their covered family members are referred
to as "Covered Persons." Use of the word "he" in this Contract refers to he or she.

(Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000035)

"Covered Person" is defined as "[a] Member and his covered family dependents,

as defined under Section B of this Article. The term 'Member' means either an employee or

member of a group." (Id.) "Covered Services" is defined as "[t]he services for which the

Covered Person is entitled to receive benefits under the terms of this Contract." (Id.)

"Facilities" is defined as "providers which administer benefits for ambulatory

surgery, outpatient treatment for alcoholism and substance abuse, home health care, dialysis,

hospice care and skilled nursing facilities." (Id. at 000036) "Hospital" is defined as "a . . . fully

licensed acute care general hospital that has on its own premises all of the following:"

3

a. A broad scope of major surgical, medical, therapeutic, and diagnostic services available at all times to treat almost all illnesses, accidents and sudden emergencies

b. 24-hour general nursing service by registered nurses who are on duty and present in the Hospital at all times

c. A fully-staffed operating room suitable for major surgery together with anesthesia service and equipment. The Hospital must perform major surgery frequently enough to maintain a high level of expertise with respect to such surgery in order to ensure quality care

d. Assigned emergency personnel and a "crash cart" to treat cardiac arrest and other medical emergencies

e. Diagnostic radiology facilities

f. A pathology laboratory

g. An organized medical staff of licensed doctors.

(Id.)

The Plan further states "[t]he following providers are not considered Hospitals as defined in this Contract: nursing or convalescent homes and institutions; rehabilitation facilities (unless such a facility has a network agreement with us); institutions primarily for rest or for the aged; spas; sanitariums; infirmaries at schools, colleges or camps; and any institution primarily for the treatment of drug addiction, alcoholism, or mental or nervous disorders." (Id.)

"Mental and Behavioral Health Care Manager" is defined as "the managed care program designed to provide advance, written authorization for mental health care benefits. This includes benefits for alcohol and substance abuse." (Id.)

The Plan warns that "unless otherwise stated, we will not pay for any treatment, service or supply that we determine is not medically necessary. Medically Necessary means care which, according to our criteria, and in our judgment, is:"

- consistent with the systems or diagnosis and treatment of your condition, disease, ailment or injury;

4

- in accordance with standards of good medical practice;

- not solely for your convenience, or that of your physician or other provider;

- not primarily custodial; and

- the most appropriate supply or level of service which can safely be provided to you.

(Id.)

"Out-of-Network Benefits" are defined as "covered services which have been provided by, (1) Hospitals and Facilities which are not In-Network Providers; or (2) professional providers who are not In-Network Providers." (Id.) "Provider means an individual (professional Provider) or entity (Hospital or Facility) that provides covered benefits to persons eligible for coverage under this Contract." (Id.)

"Skilled Nursing Care" is defined as:

[M]edical or nursing care or rehabilitation services for injured, disabled or sick persons, which is received in a Skilled Nursing Facility, under the direct supervision of a doctor, registered professional nurse, physical therapist or other health care professional, when such care is, in our judgment, medically necessary and appropriate and is approved by us. Care which is primarily assistance with the activities of daily living does not qualify as Skilled Nursing Care.

(Id. at 000053)

## B. Medical Management Program

The Plan contains a "Medical Management Program" that "the Covered Person must comply with in order to be eligible to receive the maximum In-Network and Out-of-Network benefits available under" the Plan. (Id. at 000040-45). "The Covered Person is responsible for ensuring that the pre-certification requirements are met unless th[e] contract specifically states otherwise." (Id. at 000040)

5

The Medical Management Program requires the Covered Person to "call the Mental and Behavioral Health Care Manager for authorization prior to receiving the following services or a penalty will be imposed on benefits otherwise available:"

- Inpatient or outpatient mental health care (covered in-network only)
- Inpatient Alcohol and Substance Abuse Detoxification (covered in-network only)
- Outpatient alcohol and substance abuse care (covered both in-network and out-of-network)

(Id.) If the Covered Person does not comply with the pre-authorization requirement for an inpatient mental health admission, a "50% [penalty] on each admission up to $5,000 per admission[]" will be applied. (Id.) "The penalty also applies to the professional visits for services rendered during an inpatient admission." (Id.)

The following services are also covered "as in-network only and must be pre-authorized": (i) Hospice; (ii) Occupational and Speech Therapy; (iii) Physical Therapy; (iv) MRIs; (v) Skilled Nursing Facility; (vi) Home infusion therapy; and (vii) Durable Medical Equipment and Prosthetics and Orthotics. (Id. at 000041) As with inpatient mental health treatment, there is a "penalty of 50% up to $5,000 on each visit or each admission[]" for "[f]ailure to precertify – and the penalty "also applies to the professional visits for services rendered during an inpatient admission." (Id.)

A rider to the Plan modifies the penalty, however, stating that "[t]he penalty referred to in the Medical Management Program section . . . is changed and all references to $5,000 are deleted and replaced with $2,500." (Id. at 000020)

## C.     Out-of-Network Coverage Exclusion for Inpatient Mental Health Care

The Plan states that a "Covered Person may elect to receive covered benefits from an Out-of-Network Provider. . . . Not all benefits are available on an Out-of-Network basis. The

6

use of out-of-network providers may result in substantial out-of-pocket expenses. . . . Th[e Out-of-Network] Allowed Amount may be substantially less than the provider's charge." (Id. at 000001) The Plan further states that "[t]he level of reimbursement, and, at times, the availability of benefits described in this Contract will vary depending on whether the services are received In-Network or Out-of-Network" (id. at 000037), and "[t]here are situations, as stated in this Contract, where no Out-of-Network benefits are available." (Id. at 000046)

Out-of-Network Benefits provisions apply when (1) the "Covered Person receives services in a Hospital or Facility that is not an In-Network Provider," or (2) the "Covered Person goes to a professional provider who is not an In-Network Provider." (Id.)

The Plan states that "[n]o Out[-]of[-]Network benefits are available for inpatient mental and behavioral health care . . . including inpatient alcoholism and substance abuse care." (Id.) Likewise, "[t]here are no out-of-network benefits for Skilled Nursing Facility or Hospice Care." (Id.)

Article III of the Plan states that "[o]nly In-Network benefits are available for inpatient mental health care and inpatient alcohol and substance abuse" and "outpatient mental health care." (Id. at 000045, 000056) Article IV of the Plan further explains that "[i]f the Covered Person does not go to an In-Network Hospital the benefits will be out of network subject to the network deductible and coinsurance requirements of this Contract. No Out of Network benefits are available for inpatient mental and behavioral health care benefits including inpatient alcoholism and substance abuse care." (Id. at 000046) Article IV also states that "[i]f the Covered [P]erson does not go to participating facilities for benefits described in Articles VI, VII, VIII, and IX the benefits will be out of network. There are no out-of-network benefits for Skilled Nursing Facility or Hospice care." (Id.)

7

Article V states that "[t]o qualify for inpatient Hospital benefits, as defined in Article I, Section B(9) of this Contract, a Covered Person must be a registered bed patient in a Hospital and under the care of a doctor for the treatment of illness, injury or pregnancy and for which treatment cannot be safely and effectively provided on an outpatient basis." (Id. at 000047) A subsection entitled "Mental Health Care and Care for the Treatment of Alcoholism and Substance Abuse" states that "[b]enefits must be received from an In-Network Provider and must be pre-authorized by the Mental and Behavioral Health Care Manager. In case of an emergency, the Covered Person must contact the Mental and Behavioral Care Manager within twenty four (24) hours of admission or as soon as the Covered Person is medically able to do so." (Id. at 000048)

Article X and Article XI of the Plan likewise state that "[t]here are no out-of-network benefits under this Contract" for hospice care or Skilled Nursing Facility Care. (Id. at 000052-53)

Article XII lists various medical benefits, and reiterates that mental health care benefits are "only available in-network," and that "[t]here are no Out-of-Network benefits [for mental health care]." (Id. at 000056-57)

Article XIII of the Plan "explains the limits and benefits and sets forth other services . . . that are excluded from coverage under th[e] Contract." (Id. at 000060) Article XIII states that "[t]here are no Out-of-Network benefits under this Contract for the inpatient treatment of mental and behavior disorders or alcohol detoxification, and rehabilitation." (Id. at 000063)

There is a rider to the Plan regarding mental health care and alcohol and substance abuse care (the "Mental Health Care Rider"). (Id. at 000088) The Mental Health Care Rider

8

provides that "[c]overage for inpatient services for mental health care is limited to facilities as defined by subdivision ten of section 1.03 of the New York Mental Hygiene Law." (Id.)

## D. Residential Treatment Services Exclusion

The Plan also contains a chart – entitled "Your Benefits At A Glance" – which provides an "overview" of coverage. (Id. at 000330) A footnote to the section entitled "HOSPITAL SERVICES" states that the Plan "[d]oes not include inpatient or outpatient behavioral healthcare of physical therapy/rehabilitation. Residential treatment services are not covered." (Id. at 000334 n. 1 (emphasis added)) Various out-of-network services – including obstetrical care in a birthing center, durable medical equipment, orthotics, prosthetics, skilled nursing facility, hospice, occupational therapy, speech therapy, and vision therapy – are also listed as "[n]ot covered" under the Plan. (Id. at 000333-36)

Subsection 5 of the Mental Health Care Rider – entitled **"Services Not Covered"** – states:

Nothing in the Rider shall be construed to cover benefits for mental health, alcohol and substance abuse services: for individuals who are presently incarcerated, confined or committed to a local correctional facility or prison, or to a custodial facility for youth operated by the Office of Children and Family Services; solely because such services are ordered by a court; that are cosmetic in nature on the grounds that changing or improving an individual's appearance is justified by the individual's mental health needs; that are experimental or investigational treatments; residential treatment services; or that are otherwise excluded under your Contract, Certificate or Group Health Plan.

(Id. at 000089 (emphasis added))

9

# II. PLAINTIFF'S CLAIMS FOR C.M.'S MENTAL HEALTH CARE

C.M. has a history of mental illness. (See id. at 000276, 000285)

In about April 2014, C.M. received mental health care treatment at Telos

Residential Retreat, LLC – a residential treatment facility. (See id. at 000230, 000514) A claim

was submitted to the Plan for these residential treatment services. (See id. at 000514)

On July 18, 2014, Empire issued a letter denying the claim. (Id.; Pltf. R. 56.1

Counterstmt. (Dkt. No. 67-1) ¶¶ 40-41) The letter states that Empire is denying benefits for

residential treatment services at Telos Residential Retreat because "[r]esidential [t]reatment [is]

not . . . a covered service under your policy." (Genovese Decl., Ex. C (Administrative Record)

(Dkt. No. 58-3) at 000514) The letter further states:

> As noted in your Fordham University PPO plan benefit booklet under "Hospital
> Limitations & Exclusions" on page 17, it is stated as follows . . . [r]esidential treatment
> services are not covered.

(Id.)

On July 15, 2014, C.M. was admitted to Logan River Academy, LLC – a

residential treatment facility located in Utah. (Id. at 000278, 000285; Pltf. R. 56.1 Counterstmt.

(Dkt. No. 67-1) ¶¶ 39, 42) Logan River provided C.M. with "structured, academic, therapeutic,

residential treatment," including "individual, family, group, and milieu therapy surrounding

issues of emotional and behavioral self-regulation" and "[m]edication management." (Genovese

Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000277)

Plaintiff submitted pharmacy and non-pharmacy provider claims to Empire

related to C.M.'s residential treatment at Logan River for dates of service commencing July 16,

2014 and continuing through December 2014. (Id. at 000171, 000180-89, 000230, 000236-39;

Pltf. R. 56.1 Stmt. (Dkt. No. 57-2) ¶ 10; Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶¶ 46, 48)

10

Empire paid $1,604.40 of the $5,260.32 charge for the services provided to C.M.

during his first two weeks of treatment at Logan River. (Genovese Decl., Ex. C (Administrative

Record) (Dkt. No. 58-3) at 000169-71) In a November 19, 2014 Statement regarding the claim,

Empire states

> This service is not covered because we were not notified in accordance with your policy's Medical Management Guidelines. You are responsible for the amount shown in "Your Total Responsibility". Please refer to the section of your contract which describes the requirement of our Medical Management Program.

(Id. at 000171)

A November 21, 2014 Statement to Plaintiff regarding claims for C.M.'s August

2014 treatment at Logan River states:

> We have received the above noted health insurance claim and we have sent a request to the provider of service to obtain additional clinical information needed to process the claim. As soon as we receive the required information, we will complete our review. If the information is not received within 45 days we will make a determination based on the information available.

(Id. at 000172-74)

In a December 22, 2014 Statement to Plaintiff regarding services C.M. received at

Logan River in November 2014, Empire denied the claim. (Id. at 000175-77) Empire stated that

"[t]his service is not payable for the diagnosis stated on the claim." (Id. at 000177)

In a January 15, 2015 Statement to Plaintiff regarding C.M.'s August 2014

treatment at Logan River, Empire denied the claim. (Id. at 000178-80) Empire stated:

> This is not a covered service under your policy. Please refer to the exclusions of your contract or benefit booklet for further details.

(Id. at 000180)

11

In a January 26, 2015 Statement to Plaintiff regarding C.M.'s treatment at Logan River in December 2014, Empire denied the claim, stating "[t]his is not payable for the diagnosis stated on the claim." (Id. at 000181-83)

In a January 30, 2015 Statement to Plaintiff regarding C.M.'s treatment at Logan River in September 2014, Empire again denied benefits stating, "[t]his is not a covered service under your policy. Please refer to the exclusions section of your contract or benefit booklet for further details." (Id. at 000184-86)

In another January 30, 2015 Statement to Plaintiff, Empire denied benefits for C.M.'s treatment at Logan River in October 2014. (Id. at 000187-89) Empire stated, "[t]his service is not payable for the diagnosis stated on the claim." (Id. at 000189)

In about October 2014, C.M.'s mother submitted an appeal concerning Empire's denial of benefits for services rendered to C.M. at Logan River between July and September 2014. (See id. at 000505) In the appeal, C.M.'s mother stated that she believed that the services C.M. received at Logan River should be covered as a result of the "Health Care Parity Act of 2008." (See id.)

In an October 28, 2014 letter, Empire addressed the appeal. (Id.; Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶ 56) The October 28, 2014 letter contains a claims chart indicating that Empire is still processing claims for treatment services provided to C.M. at Logan River Academy between July 16, 2014 and September 30, 2014. (Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000505) As for claims for services rendered at other residential treatment centers between January 19, 2014 and July 15, 2014, Empire's letter states that "[t]he previous coverage decision is being upheld." Empire further states:

12

> You are enrolled on Empire's Deluxe PPO plan. The Benefits at a Glance section of your Benefit Book explains what is covered. The <u>Mental Health Care</u> section specifically states that, "Residential treatment services are not covered."

(<u>Id.</u> (emphasis in original))

In response to C.M.'s mother's argument that the "Health Care Parity Act of 2008" requires that benefits be provided for residential treatment services rendered to C.M., Empire states:

> We examined the Health Care Parity Act of 2008. The Final Rule issued by the Department of Labor states, "Applicability date. The mental health parity provisions of these final regulations apply to group health plans and health insurance issuers for plan years (or, in the individual market, policy years) beginning on or after July 1, 2014."
>
> Empire is implementing the required changes to the group contracts as each group renews their contact [sic]. If your employer chooses to renew their contract with Empire, the new benefits will go into effect on January 1, 2015. Until that time, you are governed by the current contract and [residential treatment care] is not covered under the current contract. The denied authorization remains upheld.
>
> We reviewed all your claims for [residential treatment care]. We see that payment was issued on some of these claims in error. Under separate cover(s), we will be sending you refund requests for those payments that were sent to you in error.

(<u>Id.</u> at 000506)

C.M.'s mother again appealed the denial of benefits. (<u>See id.</u> at 000509; Def. R. 56.1 Counterstmt. (Dkt. No. 63) ¶ 19) In a December 17, 2014 letter, Empire again denied the request for benefits for C.M.'s treatment at Logan River. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶ 57; Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000509) Empire's letter states:

> We sent you a letter with our final coverage decision for this matter on October 28, 2014. It includes information about any additional rights that may be available to you.
>
> On the issue of our interpretation of the Health Care Parity Act of 2008, when we implemented the Act, we were guided by the regulations issued in 2010. With respect to whether plans were required to provide coverage for residential treatment centers, the regulations indicated that they were not going to address "scope of services" (i.e.,

13

whether plans had to provide coverage for every type of provider) and instead asked for comments to inform them of how to address it in the final regulations. Accordingly, residential treatment centers were allowed to be excluded. The pertinent paragraphs in the preamble that discuss this say (Pages 5416 & 5417):

"The Departments received many comments addressing an issue characterized as "scope of services" or "continuum of care". Some commenters requested, with respect to a mental health condition or substance use disorder that is otherwise covered, that the regulations clarify that a plan is not required to provide benefits for any particular treatment or treatment setting (such as counseling or non-hospital residential treatment) if benefits for the treatment or treatment setting are not provided for medical/surgical conditions. Other commenters requested that the regulations clarify that a participant or beneficiary with a mental health condition or substance use disorder have coverage for the full scope of medically appropriate services to treat the condition or disorder if the plan covers the full scope of medically appropriate services to treat medical/surgical conditions, even if some treatments or treatment settings are not otherwise covered by the plan. Other commenters requested that MHPAEA [( the Mental Health Parity and Addiction Equity Act of 2008)] be interpreted to require that group health plans provide benefits for any evidence based treatment.

"The Departments recognize that not all treatments or treatment settings for mental health conditions or substance use disorders correspond to those for medical/surgical conditions. The Departments also recognize that MHPAEA prohibits plans and issuers from imposing treatment limitations on mental health and substance use disorder benefits that are more restrictive than those applied to medical/surgical benefits. These regulations do not address the scope of services issue. The Departments invite comments on whether and to what extent MHPAEA addresses the scope of services or continuum of care provided by a group health plan or health insurance coverage."

The final regulations, which were issued on November 13, 2013, do address scope of services. Accordingly, for plan years beginning on or after July 1, 2014, plans will need to determine whether residential treatment coverage will now be considered a covered benefit.

Your group did not have coverage for Residential Treatment Centers in 2014. We are upholding our prior determination. Your grievance rights with Empire are exhausted. This is our final decision.

(Id. at 000509-10)

In a December 29, 2014 letter to C.M., Empire stated:

The medical management department is in receipt of a request to review residential services provided by Logan River Academy for the above-named member. We are unable to authorize the dates of service beginning July 9, 2014 inclusive for the following

14

contractual reasons: . . . The requested service(s) are excluded from the member's contract (please refer to the exclusion section of your benefit plan description).

(Id. at 000314)

\* \* \* \*

This action was filed on July 15, 2016. Pending before the Court are the parties' cross-motions for summary judgment. (Mots. (Dkt. Nos. 56, 57))

## DISCUSSION

## I. LEGAL STANDARDS

### A. ERISA Standard of Review

"It is appropriate to consider a challenge under ERISA to the denial of . . . benefits as a summary judgment motion reviewing the administrative record." Suarato v. Building Services 32BJ Pension Fund, 554 F. Supp. 2d 399, 414-15 (S.D.N.Y. 2008) (citing Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003)).

"[A] denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the plan grants such discretionary authority, courts "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009). "The plan administrator bears the burden of proving that the deferential standard of review applies." Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (citing Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999)).

"Under the arbitrary and capricious standard of review, [a court] may overturn an administrator's decision to deny ERISA benefits 'only if it was without reason, unsupported by

15

substantial evidence or erroneous as a matter of law.'" Hobson, 574 F.3d at 83 (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] . . . requires more than a scintilla of evidence but less than a preponderance.'" Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (alterations in original) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)). "This scope of review is narrow," Hobson, 574 F.3d at 83, and "'[a]bsent a showing of bad faith or arbitrariness, the court will not disturb [the administrator's] interpretations of [the] plan as long as they are consistent with the plan's terms and purpose.'" Sansevera v. DuPont de Nemours & Co., 859 F. Supp. 106, 112 (S.D.N.Y. 1994) (quoting Seff v. NOITU Ins. Trust Fund, 781 F. Supp. 1037, 1040 (S.D.N.Y. 1992)). Indeed, where both parties "offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control." Pulvers v. First Unum Life Ins., Co., 210 F.3d 89, 92-93 (2d Cir. 2000).

Moreover, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." Miller, 72 F.3d at 1071; Bergquist v. Aetna U.S. Healthcare, 289 F. Supp. 2d 400, 411 (S.D.N.Y. 2003) ("The Court must limit its examination of evidence to the administrative record [and information available to the plan administrator at the time it made its decision] when reviewing administrative decisions under the arbitrary and capricious standard."). The court is "'not free to substitute [its] own judgment for that of [the plan administrator] as if [it] were considering the issue of eligibility anew.'" Hobson, 574 F.3d at 83-84 (2d Cir. 2009) (quoting Pagan, 52 F.3d at 442).

16

Here, the parties agree that the Plan grants Empire discretionary authority to

interpret the terms of the Plan and to administer the Plan. (See Pltf. R. 56.1 Counterstmt. (Dkt.

No. 67-1) ¶ 37) The Plan expressly provides that

> [Empire] may develop or adopt standards which describe in more detail when we will or will not make payments under this Contract and administrative rules pertaining to Group eligibility and enrollment and other administrative matters. We shall have all the powers necessary or appropriate to enable us to carry out our duties in connection with the administration of this Contract, including, without limitation thereto, the power to construe this Contract, to determine all questions arising under this Contract, and to make and establish (and thereafter change) rules and regulations and procedures with respect to this Contract. If you or a Covered Person have a question about the standards which apply to a particular benefit or the Group administrative rules, you or the Covered Person may contact us and we will explain the standards or rules.

(Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000073-74) Accordingly, the

arbitrary and capricious standard governs this Court's review of Empire's interpretation of the

Plan.

To the extent that Empire's compliance with applicable statutes and regulations is

at issue, however, Empire's views are entitled to no deference. See Wilkins v. Mason Tenders

Dist. Council Pension Fund, 445 F.3d 572, 581 (2d Cir. 2006) (Where the question presented "is

simply one of statutory interpretation[,]" courts "owe the plan administrators no deference.").

Rather, "'[t]he interpretation of . . . a federal statute[] is a question of law subject to de novo

review.'" Id. (quoting Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 111 (2d Cir. 2003)).

## B.     The Parity Act

"Congress enacted the [Mental Health Parity and Addiction Equity Act of 2008

(the "Parity Act")] to end discrimination in the provision of insurance coverage for mental health

and substance use disorders as compared to coverage for medical and surgical conditions in

employer-sponsored group health plans." Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,

821 F.3d 352, 356 (2d Cir. 2016) (citing Coalition for Parity, Inc. v. Sebelius, 709 F. Supp. 2d 10,

17

13 (D.D.C. 2010)). "Essentially, [the Parity Act requires] ERISA plans [to] treat sicknesses of the mind in the same way that they would a broken bone." New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp., 980 F. Supp. 2d 527, 542 (S.D.N.Y. 2013), aff'd in part, vacated in part, 798 F.3d 125 (2d Cir. 2015). "Although there is no private right of action under the Parity Act, portions of the law are incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA § 502." Am. Psychiatric Ass'n v. Anthem Health Plans, 50 F. Supp. 3d 157, 161 (D. Conn. 2014) (citations omitted), aff'd, 821 F.3d 352 (2d Cir. 2016).

In order to achieve its statutory objective, the Parity Act "requires group health plans and health insurance issuers to ensure that the financial requirements (deductibles, copays, etc.) and treatment limitations applied to mental health benefits be no more restrictive than the predominant financial requirements and treatment limitations applied to substantially all medical and surgical benefits covered by the plan or insurance." New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp., 798 F.3d 125, 128 (2d Cir. 2015) (citing 29 U.S.C. § 1185a(a)(3)(A)). The Parity Act also prohibits "separate cost sharing requirements" and "separate treatment limitations that are only applicable with respect to mental health or substance use disorder benefits." See 29 U.S.C. § 1185a(a)(3)(A)(i)-(ii).

The Parity Act defines "treatment limitation" by reference to the scope and duration of treatment. In particular, the "'term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment.'" C.M. v. Fletcher Allen Health Care, Inc., No. 5:12 Civ. 108, 2013 WL 4453754, at *2 (D. Vt. Apr. 30, 2013) (quoting 29 U.S.C. § 1185a(a)(3)(B)(iii)).

The Parity Act directs the Secretaries of Labor, Health and Human Services, and Treasury to "publish and widely disseminate guidance and information for group health plans,

18

participants and beneficiaries . . . concerning the requirements of [the Parity Act.]" 29 U.S.C. §

1185a(g); see also Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified as 42 U.S.C. § 300gg-5)

("Not later than 1 year after the date of enactment of this Act, the Secretaries of Labor, Health

and Human Services, and the Treasury shall issue regulations to carry out the amendments made

by subsections (a), (b), and (c)[.]"). Congress provided, however, that the Parity Act's

requirements would go into effect on or after October 3, 2009, regardless of whether the agencies

promulgated rules. Natalie V. v. Health Care Serv. Corp., No. 15 Civ. 09174, 2016 WL 4765709,

at *3 (N.D. Ill. Sept. 13, 2016) (citing Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified as 42

U.S.C. § 300gg-5) ("The amendments made by this section shall apply with respect to group

health plans for plan years beginning after the date that is 1 year after the date of enactment of

this Act [(October 3, 2008)], regardless of whether regulations have been issued to carry out such

amendments by such effective date."); Interim Rules Under the Paul Wellstone and Pete

Domenici Mental Health Parity and Addiction Equity Act of 2008 (the "Interim Final Rules"), 75

Fed. Reg. 5410-01, 5411 (Feb. 2, 2010) ("The changes made by [the Parity Act] are generally

effective for plan years beginning after October 3, 2009.")).

## 1. The Interim Final Rules

In February 2010 – four months after the Parity Act took effect in October 2009 –

the agencies published the Interim Final Rules in the Federal Register. Id. at *4 (citing 75 Fed.

Reg. 5410-01; 29 C.F.R. § 2590.712 (2010)) The Interim Final Rules went into effect on April 5,

2010, and remained in effect until they were replaced with the Final Rules, which went into

effect in 2014. See Interim Final Rules, 75 Fed. Reg. at 5410; 29 C.F.R. § 2590.712 (2010). The

Interim Final Rules applied to group health plans "for plan years beginning on or after July 1,

2010." See Interim Final Rules, 75 Fed. Reg. at 5410.

19

The Interim Final Rules apply the parity requirements "on a classification-by-classification basis" (id. at 5412), and establish six "classifications of benefits" for determining Parity Act compliance: (1) inpatient, in-network; (2) in-patient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. 29 C.F.R. § 2590.712(c)(2)(i)-(ii)(A) (2010). "While the regulations left it to group health plans to define, for example, 'inpatient, outpatient, and emergency care,' they . . . mandate that plans apply those terms 'uniformly' for both mental health and medical/surgical benefits." Natalie V., 2016 WL 4765709, at \*4 (quoting Interim Final Rules, 75 Fed. Reg. at 5413).

Within each classification, group health plans are required to provide the same treatment limitations for mental health and medical surgical benefits – meaning that a group health plan "[can]not apply any . . . treatment limitation to mental health . . . benefits in any classification that is more restrictive than the . . . treatment limitation of that type applied to . . . medical/surgical benefits in the same classification." See 29 C.F.R. § 2590.712(c)(2)(i) (2010). Moreover, "if a plan provide[s] any benefits for a mental illness, the group health plan ha[s] to provide those benefits in each classification for which it provide[s] any medical/surgical benefits." Natalie V, 2016 WL 4765709, at \*4 (citing 29 C.F.R. § 2590.712(c)(2)(ii)(A) (2010); Interim Final Rules, 75 Fed. Reg. at 5413).

Under the Interim Rules, treatment limitations include both "quantitative" and "nonquantitative" treatment limitations. Fletcher Allen Health Care, Inc., 2013 WL 4453754, at \*2 (citing 29 CFR § 2590.712(a) (2010)). Quantitative treatment limitations "are expressed numerically (such as 50 outpatient visits per year)." 29 CFR § 2590.712(a) (2010). By contrast, non-quantitative treatment limitations "limit the scope or duration of benefits for treatment under

20

a plan." Id. "A permanent exclusion of all benefits for a particular condition or disorder,

however, is not a treatment limitation." Id.

The Interim Rules also establish a standard for scrutinizing the validity of non-

quantitative treatment limitations:

> A group health plan (or health insurance coverage) may not impose a nonquantitative
> treatment limitation with respect to mental health or substance use disorder benefits in
> any classification unless, under the terms of the plan (or health insurance coverage) as
> written and in operation, any processes, strategies, evidentiary standards, or other factors
> used in applying the nonquantitative treatment limitation to mental health or substance
> use disorder benefits in the classification are comparable to, and are applied no more
> stringently than, the processes, strategies, evidentiary standards, or other factors used in
> applying the limitation with respect to medical surgical/benefits in the classification,
> except to the extent that recognized clinically appropriate standards of care may permit a
> difference.

29 C.F.R. § 2590.712 (emphasis added). "In other words, as long as a health insurance company

use[s] comparable processes, strategies, evidentiary standards, or other factors when applying

treatment limitations to all benefits in a group health plan, that plan [is] Parity Act-compliant."

Natalie V., 2016 WL 4765709, at *5. The Interim Final Rules explain that the "no more

stringently" language is "included to ensure that any processes, strategies, evidentiary standards,

or other factors that are comparable on their face are applied in the same manner to

medical/surgical benefits and to mental health or substance use disorder benefits." Interim Final

Rules, 75 Fed. Reg. at 5416 (emphasis added). When plans apply treatment limitations to mental

health and medical/surgical benefits, "the mere fact of disparate results" does not necessarily

result in a violation of the Parity Act, however, so long as "the processes, strategies, evidentiary

standards, and other factors" used in applying nonquantitative treatment limitations are applied

"in a comparable manner to all benefits." Id.; see also Natalie V, 2016 WL 4765709, at *5.

Although the Interim Rules "provided much needed guidance on 'nonquantitative

treatment limitations' . . . they left one major issue unaddressed: the extent to which . . . the

21

'scope of services' that a plan offered for mental health conditions had to be on par with those offered for medical/surgical conditions." Natalie V, 2016 WL 4765709, at \*5. The agencies noted that

> [s]ome commenters requested, with respect to a mental health condition or substance use disorder that is otherwise covered, that the regulations clarify that a plan is not required to provide benefits for any particular treatment or treatment setting (such as counseling or non-hospital residential treatment) if benefits for the treatment or treatment setting are not provided for medical/surgical conditions. Other commenters requested that the regulations clarify that a participant or beneficiary with a mental health condition or substance use disorder have coverage for the full scope of medically appropriate services to treat the condition or disorder if the plan covers the full scope of medically appropriate services to treat medical/surgical conditions, even if some treatments or treatment settings are not otherwise covered by the plan. Other commenters requested that [the Parity Act] be interpreted to require that group health plans provide benefits for any evidence-based treatment.

75 Fed. Reg. at 5416. In response to these comments, the agencies acknowledged that "not all treatments or treatment settings for mental health conditions or substance use disorders correspond to those for medical/surgical conditions." Id. The agencies chose "not [to] address the scope of services issue" in the Interim Final Rules, however, and instead "invite[d] comments on whether and to what extent [the Parity Act] addresses the scope of services [issue]." Id. at 5416-5417.

## 2. **The Final Rules**

The Final Rules were published on November 13, 2013. See Final Rules Under the Parity Act of 2008 (the "Final Rules"), 78 Fed. Reg. 68,240-01 (Nov. 13, 2013) (codified at C.F.R. § 2590.712 (2014)). The Final Rules had an effective date of January 13, 2014, and they applied to group health plans "beginning on or after July 1, 2014." See id. at 68,240.

The Final Rules retain the Interim Rules' six "classifications," and likewise mandate that "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification are

22

comparable to, and are applied no more stringently than, the processes, strategies, evidentiary

standards, or other factors used in applying the limitation with respect to medical/surgical

benefits in the [same] classification." 29 C.F.R. § 2590.712(c)(2)(ii)(A), (c)(4)(i) (2014).

The Final Rules also address the "scope of services" issue – i.e., "the types of

treatment and treatment settings that are covered by a group health plan or health insurance

coverage." 78 Fed. Reg. at 68,246. The agencies noted that

[m]any commenters requested that the Departments clarify how [the Parity Act] affects
the scope of coverage for intermediate services (such as residential treatment, partial
hospitalization, and intensive outpatient treatment) and how these services fit within the
six classifications set forth by the interim final regulations. Some commenters suggested
that the final regulations establish what intermediate mental health and substance use
disorder services would be analogous to various intermediate medical/surgical services
for purposes of the [the Parity Act's] parity analysis. Other commenters suggested that
the Departments not address scope of services in the final regulations.

The Departments did not intend that plans and issuers could exclude intermediate levels
of care covered under the plan from [the Parity Act's] parity requirements. At the same
time, the Departments did not intend to impose a benefit mandate through the parity
requirement that could require greater benefits for mental health conditions and substance
use disorders than for medical/surgical conditions.

. . . .

Although the interim final regulations did not define the scope of the six classifications of
benefits, they directed that plans and issuers assign mental health and substance use
disorder benefits and medical/surgical benefits to these classifications in a consistent
manner. This general rule also applies to intermediate services provided under the plan or
coverage. Plans and issuers must assign covered intermediate mental health and
substance use disorder benefits to the existing six benefit classifications in the same way
that they assign comparable intermediate medical/surgical benefits to these
classifications. For example, if a plan or issuer classifies care in skilled nursing facilities
or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat
any covered care in residential treatment facilities for mental health or substance user
disorders as an inpatient benefit. In addition, if a plan or issuer treats home health care as
an outpatient benefit, then any covered intensive outpatient mental health or substance
use disorder services and partial hospitalization must be considered outpatient benefits as
well.

These final regulations also include additional examples illustrating the application of the
[non-quantitative treatment limitation] rules to plan exclusions affecting the scope of
services provided under the plan. The new examples clarify that plan or coverage

23

restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services must comply with the [non-quantitative treatment limitation] parity standard under these final regulations.

Id. at 68,246-47 (emphasis added).

## II. PLAINTIFF'S CLAIM FOR BENEFITS

Plaintiff argues that Empire's denial of benefits for C.M.'s mental health care at Logan River Academy was erroneous because it was based solely on Empire's exclusion of coverage for residential treatment services. (Pltf. Br. (Dkt. No. 57-1) at 9; Pltf. Opp. Br. (Dkt. No. 67) at 2) According to Plaintiff, Empire's residential treatment exclusion violates (1) the Parity Act; and (2) the New York Parity Law. (See Mot. (Dkt. No. 57); Pltf. Br. (Dkt. No. 57-1))

Empire responds that its denial of benefits for C.M.'s treatment at Logan River Academy is consistent with the Plan's exclusion of coverage for (1) residential treatment services; (2) services where a member does not comply with the Plan's pre-certification requirements; and (3) out-of-network, in-patient mental health care. (Def. Br. (Dtk. No. 59) at 11; Def. Opp. Br. (Dkt. No. 62) at 9) Empire further contends that (1) the Plan's exclusions comply with the Parity Act; and (2) the New York Parity Law does not apply. (See Def. Br. (Dtk. No. 59); Def. Opp. Br. (Dkt. No. 62))

### A. The Plan's Residential Treatment Services Exclusion

Plaintiff seeks benefits for mental health residential treatment services C.M. received at Logan River Academy between July 2014 and December 2014.[4] (See Cmplt. (Dkt.

---

[4] Because Plaintiff's Plan was in effect for "the period commencing on January 1, 2014 and ending on December 31, 2014," (see Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶ 5), the Interim Final Rules rather than the Final Rules are applicable here. See Final Rules, 78 Fed. Reg. at 68,253 ("These final regulations apply to group health plans and health insurance issuers offering group health insurance coverage on the first day of the first plan year beginning on or after July 1, 2014.").

24

No. 1) ¶¶ 20-24) In denying C.M.'s claim for benefits, Empire repeatedly stated that it was denying coverage because "[r]esidential treatment services are not covered" under the Plan (see Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000505, 000509-10), and it is undisputed here that the Plan does in fact specifically exclude coverage for "residential treatment services." (See id. at 000334 n. 1, 000089; Def. R. 56.1 Counterstmt. (Dkt. No. 63) ¶ 5)

Plaintiff contends, however, that Empire's exclusion of residential treatment services from coverage under the Plan violates the Parity Act and is impermissible under the Interim Final Rules. (Pltf. Br. (Dkt. No. 57-1) at 5; Pltf. Opp. Br. (Dkt. No. 67) at 4-9) Empire counters that the Interim Final Rules do not address "scope of services," and that therefore Empire was not required to cover residential treatment services. (See Def. Opp. Br. (Dkt. No. 62) at 9-11; Def. Br. (Dkt. No. 59) at 12-14)

As an initial matter, it must be acknowledged that the Parity Act imposed legal obligations on health plans as of October 3, 2009, irrespective of whether the agencies had promulgated regulations. See Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified as 42 U.S.C. § 300gg-5) ("The amendments made by this section shall apply with respect to group health plans for plan years beginning after the date that is 1 year after the date of enactment of this Act [(October 3, 2008)], regardless of whether regulations have been issued to carry out such amendments by such effective date[.]"); Interim Final Rules, 75 Fed. Reg. at 5411, 5419 ("The changes made by [the Parity Act] are generally effective for plan years beginning after October 3, 2009."); Final Rules, 78 Fed. Reg. at 68,253 (The Parity Act's "statutory provisions were self-implementing and generally became effective for plan years beginning after October 3, 2009."). While the Parity Act contemplates that agency regulations would provide "guidance and information for group health plans, participants and beneficiaries . . . concerning the

requirements of [the Parity Act]," 29 U.S.C. § 1185a(g), the Act's requirements are freestanding, and govern regardless of whether the associated regulations address or provide a clear answer to a particular issue. See Natalie V., 2016 WL 4765709, at *7 ("[W]here the [regulations] do not answer a question one way or the other, it is the Parity Act that controls whether a group health plan provided mental health benefits in parity with medical/surgical benefits."); Craft v. Health Care Serv. Corp., 84 F. Supp. 3d 748, 754 (N.D. Ill. 2015) ("The Parity Act is 'self-implementing' and it applied at all times relevant to this case." (citations omitted)).

Moreover, the Parity Act expressly prohibits treatment limitations on mental health benefits that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits," as well as "separate treatment limitations that are applicable only with respect to mental health . . . benefits." 29 U.S.C. § 1185a(a)(3)(A). Notably, the Parity Act defines "treatment limitation" to include "limits on the scope or duration of treatment." Id. § 1185a(a)(3)(B)(iii) (emphasis added).

Here, the Plan's exclusion regarding residential treatment services applies across the board, whether a provider is in-network or out-of-network. The exclusion thus precludes members from obtaining benefits for "24-hour supervision and [mental health] care in a non-hospital setting." See Craft, 84 F. Supp. 3d at 754. Because (1) residential treatment services are only provided to treat mental health conditions, and (2) there is no corresponding limitation on analogous treatment for medical/surgical conditions, the Plan's residential treatment services exclusion runs afoul of the Parity Act's express requirements. See id. (holding that plaintiff stated a claim for relief under the Parity Act based on a plan's residential treatment services exclusion, because there was no corresponding limitation on treatment of medical conditions); B.D. v. Blue Cross Blue Shield of Georgia, No. 16 Civ. 00099 (DN), 2018 WL 671213, at *10

26

(D. Utah Jan. 31, 2018) (granting plaintiffs summary judgment because "[t]he practical effect of [Empire's residential treatment services exclusion] is that plaintiffs received less coverage for mental health services than another participant would have received for medical/surgical benefits. This is at odds with the Parity Act's purpose to achieve coverage parity whenever a plan offers both mental health and medical/surgical benefits."); Joseph F. v. Sinclair Servs. Co., 158 F. Supp. 3d 1239, 1262 (D. Utah 2016) (granting plaintiff summary judgment because "residential treatment benefits [a]re available only for mental health conditions," and the plan's exclusion of coverage for such services "necessarily imposed a treatment limitation that applies only with respect to mental health conditions[;] [t]his violates the plain language of the Parity Act.").

Empire's contention that the Interim Final Rules authorized group health plans to exclude coverage for mental health residential treatment services is unpersuasive. Nothing in the Interim Final Rules authorizes such an exclusion. See 29 C.F.R. § 2590.712 (2010); Interim Final Rules, 75 Fed. Reg. 5410-01. To the contrary, despite public comments requesting that the agencies create an exception for coverage of residential treatment services, the Interim Final Rules expressly declined to address the "scope of services" issue. See Interim Final Rules, 75 Fed. Reg. at 5416-17 (The Interim Final Rules "do not address the scope of services issue."). Instead, the Interim Final Rules request additional public comment, while emphasizing that the Parity Act "prohibits plans . . . from imposing treatment limitations on mental health and substance use disorder benefits that are more restrictive than those applied to medical/surgical benefits." See id. at 5417. The agencies' decision to set aside the "scope of services" issue for

another day "does not constitute an endorsement of treatment-setting limitations."[5] See Natalie V, 2016 WL 4765709, at \*7; Craft, 84 F. Supp. 3d at 756 (rejecting Empire's due process defense because "[i]t would be a stretch to conclude from the Departments' request for comments that it was authorizing issuers to enforce treatment-setting limitations. The[] [agencies] simply were not prepared to issue guidance at that time.").

Moreover, the Interim Final Rules confirm that "the parity requirements in the statute apply to both quantitative and nonquantitative treatment limitations," see Interim Final Rules, 75 Fed. Reg. at 5412; 29 C.F.R. § 2590.712(a) (2010) ("Treatment limitations include both quantitative treatment limitations . . . and nonquantitative treatment limitations."), and they define "nonquantitative treatment limitations" as limitations on the "scope or duration of benefits for treatment under a plan or coverage." See 29 C.F.R. § 2590.712(a) (2010) (emphasis added). The Interim Final Rules also provide that where a plan provides benefits for a mental health condition, the plan must provide benefits for that mental health condition in every classification in which medical/surgical benefits are provided – meaning that an exclusion for mental health benefits from a classification for which medical/surgical benefits are provided would constitute a treatment limitation. See id. § 2590.712(c)(2)(ii)(A); Interim Final Rules, 75 Fed. Reg. at 5413. The Interim Final Rules explain that this is so because the exclusion of mental health benefits "in a classification (such as outpatient, in-network) in which it provides medical/surgical benefits . . .

---

[5] Some courts have interpreted the Interim Final Rules' failure to address the "scope of services" issue as an endorsement of a residential treatment services exclusion. See Danny P. v. Catholic Health Initiatives, No. C15-5024 (RBL), 2016 WL 3551972, at \*6 (W.D. Wash. June 30, 2016); S.S. v. Microsoft Corp. Welfare Plan, No. C14-0351 (RSM), 2015 WL 11251744, at \*1 (W.D. Wash. Feb. 11, 2015). This Court does not find the reasoning of those cases persuasive. As discussed above, the Interim Final Rules never purported to authorize a residential treatment services exclusion. Moreover, this Court finds that the exclusion violates the plain language of the statute.

[constitutes] a limit, at a minimum, on the <u>type of setting or context in which treatment is offered</u>." Interim Final Rules, 75 Fed. Reg. at 5413 (emphasis added). Thus, the Interim Final Rules make clear that separate limitations on the scope of treatment and treatment settings – applied only to mental health benefits – are impermissible.[6] See <u>Natalie V</u>, 2016 WL 4765709, at *7 ("The [Interim Final Rules] gave group health plan insurers . . . a heads-up that limitations on treatment settings were subject to the Parity Act."); <u>Craft</u>, 84 F. Supp. 3d at 757 ("There was a foreseeable risk . . . that a court might construe the statute to impose parity with respect to limitations on treatment settings.").

The Court concludes that Empire's residential treatment services exclusion violates the Parity Act, and that accordingly Empire's denial of benefits cannot be justified based on this exclusion.[7]

---

[6] When the agencies promulgated the Final Rules, they made clear that the Interim Final Rules were never intended to allow health plans to "exclude intermediate levels of care covered under the plan from [the Parity Act's] parity requirements." Final Rules, 78 Fed. Reg. at 68,246. The agencies emphasized that "[a]lthough the interim final regulations did not define the scope of the six classifications of benefits, [the Interim Final Rules] directed that plans and issuers assign mental health and substance use disorder benefits and medical/surgical benefits to these classifications in a consistent manner. This general rule also applies to intermediate services provided under the plan or coverage." Id. at 68,426-27.

[7] Because Empire's residential treatment services exclusion violates the Parity Act, it is not necessary to determine whether that exclusion also violates the New York Parity Law, N.Y. Ins. Law § 4303. It is worth noting, however, that the New York Parity Law's parity requirements only apply to "benefits for in-patient care in a hospital as defined by subdivision ten of section 1.03 of the mental hygiene law." N.Y. Ins. Law § 4303(g)(1)(A). The Mental Hygiene Law makes clear that "[r]esidential treatment facilities for children and youth are a sub-class of facilities defined to be 'hospitals' in subdivision ten of this section." N.Y. Mental Hygiene Law § 1.03(33). Subdivision 10, however, limits the definition of "hospital" to "in-patient services of a psychiatric center . . . a psychiatric in-patient facility maintained by a political subdivision of the state for the care or treatment of the mentally ill, a ward, wing, unit, or other part of a hospital . . . operated . . . <u>pursuant to an operating certificate issued by the commissioner of mental health, or other facility providing in-patient care or treatment of the mentally ill which has been issued an operating certificate by such commissioner.</u>" Id. § 1.03(10) (emphasis added). There is no evidence that Logan River Academy is operated "pursuant to an operating certificate issued by the [New York] commissioner of mental health." See id. To the contrary, Plaintiff asserts that

29

## B. The Plan's Pre-Certification Requirement and Coverage Exclusion for Out-of-Network In-Patient Mental Health Care

Empire asserts two alternative bases to justify its denial of benefits: (1) Plaintiff's

failure to comply with the Plan's pre-certification requirement; and (2) the Plan's coverage

exclusion for out-of-network in-patient mental health care. (See Def. Opp. Br. (Dkt. No. 62) at

8-9; Def. Br. (Dkt. No. 59) at 11) Empire did not assert these grounds in its final letters denying

C.M.'s claim for benefits. (See Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3)

at 000505-06, 000509-10) Accordingly, Plaintiff argues that Empire has waived these

arguments. (See Pltf. Opp. Br. (Dkt. No. 67) at 3; Mar. 19, 2018 Pltf. Ltr. (Dkt. No. 77))

### 1. Waiver

ERISA obligates a plan administrator to:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Department of Labor regulations make clear that when a claim for benefits is

denied, the plan administrator must explain in writing "[t]he specific reason or reasons for the

adverse determination"; must "[r]efer[] to specific plan provisions on which the determination is

based"; must set forth "any additional material or information necessary for the claimant to

---

Logan River "is a licensed residential treatment facility through the Utah Department of Human Services." (Pltf. Opp. Br. (Dkt. No. 67) at 10) Accordingly, it does not appear that the New York Parity Act is applicable. See Halpern v. Blue Cross/Blue Shield of W. New York, No. 12 Civ. 407S, 2014 WL 4385759, at *10 (W.D.N.Y. Sept. 4, 2014) (holding that Telos Residential Facility is not a "hospital" within the meaning of New York Mental Hygiene Law § 1.03(10), because Telos is not an inpatient facility "operating under the oversight of the office of mental health or pursuant to an operating certificate issued by that office's commissioner.").

perfect the claim and an explanation of why such material or information is necessary"; must describe "the plan's review procedures"; and "[i]n the case of an adverse benefit determination by a group health plan . . . [must specify the] rule, guideline, protocol, or other similar criterion . . . relied upon in making the adverse determination." 29 C.F.R. § 2560.503-1(g).

The notice requirement serves two purposes: (1) "notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit"; and (2) "if the [plan administrator] persists in its denial, notice can enable the member effectively to protest that decision," and prepare "'for further administrative review or an appeal to the federal courts.'" See Juliano v. Health Maint. Org. of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000) (quoting DuMond v. Centex Corp., 172 F.3d 618, 622 (8th Cir. 1999)). Courts should "'not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.'" Id. (quoting Marolt v. Alliant Techsystems, Inc., 146 F.3d 617, 620 (8th Cir.1998)); see also Martin v. Hartford Life & Acc. Ins. Co., 478 F. App'x 695, 698 (2d Cir. 2012) ("To the extent that [the plan administrator] now offers a different rationale for its denial of [plaintiff's] claim after the completion of the claim's administrative review, [the plan administrator] failed to provide [plaintiff] with the 'adequate notice . . . setting forth the specific reasons for such denial' and the 'full and fair review' to which she is entitled." (quoting 29 U.S.C. § 1133)). Accordingly, while "substantial compliance" with the regulations will suffice to meet Section 1133's mandate of "full and fair review," "substantial compliance" requires that "[a] written notice of denial . . . be comprehensible and provide the claimant with the information necessary to perfect her claim," see Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 107 (2d Cir. 2003)), facilitate "meaningful dialogues between plan administrators and plan

31

members," and permit effective review. See Juliano, 221 F.3d at 288; Cook v. New York Times Co. Long-Term Disability Plan, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *6 (S.D.N.Y. Jan. 30, 2004) (citations omitted).

Where a plan administrator raises new arguments in federal court that it did not present during the administrative process, a court must consider how the waiver doctrine applies. Lauder v. First Unum Life Ins. Co., 284 F.3d 375, 381 (2d Cir. 2002) is instructive on this point.

In Lauder, the insurer denied plaintiff's disability claim, "relying on the defense of lack of coverage," finding that plaintiff had ceased "active employment" the day before she suffered injury. Lauder, 284 F.3d at 378. Lauder sued in federal court, and the district judge rejected the insurer's active employment argument. The insurer also argued, however, that Lauder was not disabled. The district judge found that the insurer had waived that argument: the insurer "had before it preliminary information concerning Lauder's disability, but chose not to pursue an inquiry into validity of her claim for administrative reasons." Id. On appeal, as to this point, the Second Circuit affirmed. Id. at 384.

The Lauder court's analysis begins with an earlier decision – Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279 (2d Cir. 2000) – in which the court addressed the application of "common law principles of waiver . . . in the ERISA context":

There, in analyzing whether an HMO's failure to assert medical necessity as a ground for denial of the insured's claim precluded it as a defense in the ensuing lawsuit, we recognized that "under the law applicable to insurance policies, an insurer may be barred from raising defenses not asserted in communications to the insured denying coverage." Id. at 288 (citing State of New York v. AMRO Realty Corp., 936 F.2d 1420, 1431 (2d Cir.1991)). We chose, however, not to impose this rule in Juliano for two reasons. First, we found that medical necessity, which the Julianos had failed to prove, was a required element for coverage and thus could not be waived. See id. (citing Albert J. Schiff Assocs., Inc. v. Flack, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 975, 417 N.E.2d 84, 87 (1980)). Second, we were concerned with the ERISA implications of such a rule, namely, that if:

plan administrators lost the ability to assert in court reasons for declining coverage that were not asserted at the time reimbursement was declined, [ERISA] notices would threaten to become meaningless catalogs of every conceivable reason that the cost in question might not be reimbursable, instead of candid statements as to why the administrator . . . thinks reimbursement is unwarranted.

Id. We therefore declined to hold that the defense of medical necessity had been waived by the HMO.

For our purposes here, it is important to note that Juliano did not hold that the doctrine of waiver never applies to an ERISA claim. Rather, the court acknowledged that an insurer could waive certain defenses, but that waiver had not occurred in that particular case.

. . . .

[Juliano] directs us to conduct a case-specific analysis informed by its reasoning. . . .

In Juliano, we found that medical necessity was a required element of the policy under which the Julianos sought reimbursement, and that the Julianos had not proven their case on that point. [Juliano,] 221 F.3d at 287-88. Looking to the state law case of Albert J. Schiff Assocs. for guidance, we held that such a required element was analogous to whether underlying coverage existed at all, and thus could not be waived. Id. at 288. In Albert J. Schiff Assocs., the court made a distinction between policy conditions, which could be waived by the insurer's conduct, and the parameters of the underlying coverage. 435 N.Y.S.2d at 975, 417 N.E.2d 84. The court held that a claim of waiver could not be used to expand the policy so that the insured "extend[ed] its coverage to more than it originally bargained." Id. at 974-75. In the Julianos' case, to deem the defense of medical necessity to be waived, and thereby allow the Julianos to recover without proving an essential element of their claim under the policy, would improperly expand the coverage of that policy.

Id. at 380-81.

The court concluded that "Lauder's case does not raise the same concern":

Waiver here would not create coverage where none would otherwise exist; rather, Lauder's disability is exactly the type contemplated by the policy. In support of her claim, Lauder gave First UNUM evidence in the form of a Physician's Statement and an accompanying doctor's letter. She also submitted a Release of Medical Information so that First UNUM could pursue an investigation of her disability. First UNUM, of course, chose not to do so. Therefore, what First UNUM waived by its conduct was its right to investigate; the underlying disability itself was established. By giving First UNUM all the information she had to prove her case, Lauder met her obligation under the policy. Any complaints First UNUM now has about the sufficiency of such evidence are a direct result of its decision not to investigate Lauder's claim.

Because finding waiver in this case would not expand the coverage bargained for by First UNUM when it contracted with Coach, we believe Lauder's claim is distinguishable

from the Julianos', and that the distinction set forth in Albert J. Schiff Assocs. does not apply here. Instead, the waiver principle articulated in AMRO Realty, and recognized in Juliano, seems to us the better fit:

> [A]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense.

[Amro Realty Corp.,] 936 F.2d at 1431. First UNUM knew of Lauder's claim of disability, chose not to investigate it, and chose not to challenge it. It therefore waived its right to rely on lack of disability as a defense to Lauder's claim. See Pitts, 931 F.2d at 357 (finding waiver in ERISA case after "focus[ing] on the unilateral action of the insurer in failing to raise at the outset a known defense to the claim"); see also Glass, 33 F.3d at 1348 (suggesting that waiver in an ERISA case would have to be proven by evidence of "intentional relinquishment of a known right").

Additionally, the second reason we gave for our holding in Juliano – that permitting waiver posed the risk of turning ERISA notices into "meaningless catalogs" of all possible bases for denial – is not implicated by a case like this. First UNUM was not in the position of having to imagine every conceivable basis for denying Lauder's claim; it had all her evidence of her disability before it, and could easily have evaluated that evidence to assert a lack of disability defense. In other words, such a defense was not hypothetical here. Requiring First UNUM to assert the defense would lead to exactly the type of "meaningful dialogue[ ] between plan administrators and plan members" that Juliano envisioned. 221 F.3d at 288.

In contrast to Juliano, this case raises the concern that plan administrators like First UNUM will try the easiest and least expensive means of denying a claim while holding in reserve another, perhaps stronger, defense should the first one fail. In light of ERISA's remedial purpose of protecting plan beneficiaries, we are unwilling to endorse manipulative strategies that attempt to take advantage of beneficiaries in this manner. Indeed, our point in Juliano was that "candid" statements by the insurer should be encouraged. Id. First UNUM here chose to proceed on the questionable – but cheapest – argument of lack of coverage when it could easily have investigated the merits of Lauder's claim. It should not now get another proverbial bite at the apple.

Our analysis of the facts presented here leads us to conclude that principles of waiver are appropriately applied in this case. Because we do not consider this the appropriate set of facts on which to create a federal common law doctrine of waiver in the ERISA context, we limit our holding to the circumstances of this particular claim.

Id. at 381-82

Accordingly, this Court must consider (1) whether Empire failed to raise arguments during the administrative process that it now makes in support of its denial of benefits; and (2) if so, whether acceptance of Plaintiff's waiver arguments would "create coverage where none would otherwise exist." Id. at 381

### a. The Plan's Pre-Certification Requirement

As discussed above, the Plan contains a pre-certification requirement for in-patient or out-patient mental health care: a Covered Person is required to "call the Mental and Behavioral Health Care Manager for authorization prior to receiving . . . inpatient or outpatient mental health care." (Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000040) The Plan states that failure to comply with the pre-authorization requirement for an inpatient mental health admission will result in a "50% [penalty] on each admission up to $5,000 per admission. The penalty also applies to the professional visits for services rendered during an inpatient admission." (Id.) A rider to the Plan modifies the penalty, however, stating that "[t]he penalty referred to in the Medical Management Program section . . . is changed and all references to $5,000 are deleted and replaced with $2,500." (Id. at 000020)

In its November 19, 2014 letter denying – in large part – Plaintiff's claim, Empire stated that it would pay only $1,604 out of Plaintiff's $5,260.32 claim for C.M.'s first two weeks of residential treatment services at Logan River Academy, because Plaintiff had not complied with the pre-certification requirement:

> This service is not covered because we were not notified in accordance with your policy's Medical Management Guidelines. You are responsible for the amount shown in "Your Total Responsibility". Please refer to the section of your contract which describes the requirements of our Medical Management Program.

(Id. at 000169-71) Empire's later letters denying Plaintiff's appeals for benefits do not cite the pre-certification requirement, however, but instead rely solely on the Plan's residential treatment

35

services exclusion. (See Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000505-10)[8]

Plaintiff contends that Empire did not provide adequate notice of its pre-certification requirement argument in its initial denial letter, and that – in any event – it abandoned this basis for denial when it failed to articulate it in its final appeal denial letter. (Pltf. Br. (Dkt. No. 67) at 3; Mar. 19, 2018 Pltf. Ltr. (Dkt. No. 77) at 1-2) Empire counters that its November 19, 2014 letter was sufficient to place Plaintiff on notice of his failure to comply with the Plan's pre-certification requirement. (Def. Reply Br. (Dkt. No. 65) at 3; Mar. 19, 2018 Def. Ltr. (Dkt. No. 76))

As discussed above, the ERISA notice requirement is "designed to spawn meaningful dialogues between plan administrators and plan members." Juliano, 221 F.3d at 288. Notice letters are not intended to serve as "catalogs of every conceivable reason that the cost in question might not be reimbursable" (id.), and "ERISA does not require an administrator to articulate its denial in precisely the same way, each time it sends correspondence to a claimant"; rather, ERISA "merely requires 'substantial compliance' with its terms." Elsroth v. Consol. Edison Co. of New York, 10 F. Supp. 2d 427, 437 (S.D.N.Y. 1998). Moreover, courts commonly review the entirety of communications between a beneficiary and a plan administrator in assessing whether an administrator substantially complied with ERISA's notice requirements. See, e.g., Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 84 (2d Cir. 2009) (evaluating initial denial and appeal denial letters in reviewing plan administrator's denial of plaintiff's claim for

---

[8] Consistent with Empire's later approach to Plaintiff's claim, in its December 17, 2014 letter addressing Plaintiff's final appeal, Empire informed Plaintiff that it had issued a stop payment order concerning the check issued to Plaintiff for the first two weeks of residential treatment services that C.M. had received at Logan River. (Id. at 000509)

36

benefits); Mohamed v. Sanofi-Aventis Pharm., No. 06 Civ. 1504, 2009 WL 4975260, at *12 (S.D.N.Y. Dec. 22, 2009) (reviewing initial denial and appeal denial letters in determining whether plan administrator complied with ERISA's notice requirements); Langman v. Laub, No. 97 Civ. 6063 (MGC), 2002 WL 472033, at *5 (S.D.N.Y. Mar. 28, 2002) (analyzing initial and final denial letters in reviewing claim for benefits), aff'd, 328 F.3d 68 (2d Cir. 2003). The Court concludes that Empire did not abandon or waive its pre-certification argument by failing to repeat that argument in its final denial of Plaintiff's appeal.

Moreover, Empire's November 11, 2014 initial denial letter adequately explained that Plaintiff's claim was being denied – in part – because of Plaintiff's failure to comply with the Plan's pre-certification requirements. Empire informed Plaintiff that C.M.'s claim was denied in part because he had not obtained pre-certification approval "in accordance with [the] policy's Medical Management Guidelines." (Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000171) The denial letter also referred Plaintiff "to the section of your contract which describes the requirements of our Medical Management Program." (Id.) The Court concludes that Empire substantially complied with ERISA's notice requirements with respect to its pre-certification argument, and that the waiver doctrine does not apply. See Elsroth v. Consol. Edison Co. of New York, 10 F. Supp. 2d 427, 437 (S.D.N.Y. 1998) ("[D]enial need only 'provide claimant and the courts with a sufficiently precise understanding of the grounds of denial to permit a realistic possibility of review'" (citations omitted)); Camarda v. Pan Am. World Airways, Inc., 956 F. Supp. 299, 311 (E.D.N.Y. 1997) ("[P]recise compliance with the regulations is not necessary as long as the plan administrator has substantially complied with such regulations and has provided the beneficiary with sufficient information to appeal the denial."), aff'd, 162 F.3d 1147 (2d Cir. 1998).

Although the Court concludes that Empire has not waived its arguments concerning Plaintiff's failure to comply with the pre-certification requirement, Plaintiff's failure to comply with this provision would not justify wholesale denial of his claim for residential treatment services. The Plan and its rider merely impose a financial penalty for violation of the pre-certification requirement, not a blanket denial of benefits. (See Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000040-41)

### b. The Plan's Out-of-Network Coverage Exclusion

Empire contends that Plaintiff's claim for residential treatment services is barred by Plan language stating that "no Out of Network benefits are available for inpatient mental and behavioral health care benefits[,] including inpatient alcoholism and substance abuse care." (See Def. Br. (Dkt. No. 59) at 3-5, 11; Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000046) Plaintiff contends that Empire waived this argument by failing to raise it in any of its denial letters. (See May 19, 2018 Pltf. Ltr. (Dkt. No. 77)) In the alternative, Plaintiff argues that the issue of whether a residential treatment center is out-of-network or in-network "is a red herring[,] because Empire refused to cover any residential treatment center regardless of in-network or out-of-network status." (Mar. 19, 2018 Pltf. Ltr. (Dkt. No. 77) at 2 n. 2 (emphasis in original); Pltf. Opp. Br. (Dkt. No. 67) at 3-4) According to Plaintiff, because "Empire did not have any in-network [residential treatment centers] available . . . Empire also denied [Plaintiff] the opportunity . . . to find an in-network provider." (Pltf. Opp. Br. (Dkt. No. 67) at 3-4)

Although this Court directed the parties to submit supplemental letter briefs addressing whether Empire had waived its arguments regarding the Plan's pre-certification requirement and exclusion for out-of-network in-patient mental health care (see Order (Dkt. No.

75)), Empire has not addressed the waiver issue with respect to the Plan's exclusion of out-of-network coverage for in-patient mental health care. (See Mar. 19, 2018 Def. Ltr. (Dkt. No. 76))

Empire's initial denial letters do not rely on the Plan's exclusion of coverage for out-of-network in-patient mental health care as a basis for denying Plaintiff's claims. (See Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000169-89) Moreover, Empire's letters denying Plaintiff's appeals rely solely on the Plan's exclusion regarding residential treatment services, which applied regardless of whether the treatment center was in-network or out-of-network. (See id. at 000505-10) The Court concludes that Empire did not give Plaintiff notice of its out-of-network coverage argument prior to this litigation.

Accordingly, the Court must address whether finding "[w]aiver here would . . . create coverage where none would otherwise exist." See Lauder, 284 F.3d at 381. Because (1) it is undisputed that Logan River Academy is not an "In-Network" provider under the Plan (see Pltf. R. 56.1 Counterstmt. (Dkt. No. 67-1) ¶ 42); and (2) the Plan explicitly states that (a) "[o]nly In-Network benefits are available for inpatient mental health care and inpatient alcohol and substance abuse"; and (b) "No Out of Network benefits are available for inpatient mental and behavioral health care . . . including inpatient alcohol and substance abuse case" (Genovese Decl., Ex. C (Administrative Record) (Dkt. No. 58-3) at 000045-46), a finding of waiver here would indeed "create coverage where none would otherwise exist." See Lauder, 284 F.3d at 381.

As discussed above, principles of common law waiver do not apply where "the existence or nonexistence of coverage (e.g., the insuring clause and exclusions)" under an ERISA plan are at issue. See Juliano, 221 F.3d at 288 (internal quotation marks and citations omitted) (finding waiver doctrine inapplicable to plan administrator's belated medical necessity argument, because "[m]edical necessity is required for . . . reimbursement under the terms of the Contract

39

and is therefore analogous to 'the existence or nonexistence of coverage' of an insurance policy under insurance law"); Wallace v. Grp. Long Term Disability Plan For Employees of TDAmertrade Holding Corp., No. 13 Civ. 6759 (LGS), 2015 WL 4750763, at *3 (S.D.N.Y. Aug. 11, 2015) (plan administrator's argument that plaintiff had not shown that she was "under the 'Regular Care of a Physician' as required by the Plan" was not waived, because "[t]o deem this defense waived and 'thereby allow Plaintiff to recover without proving an essential element of her claim under the policy, would improperly expand the coverage of that policy.'" (citations omitted)). Because the issue here – coverage for out of network inpatient mental health care – goes to the "existence or nonexistence of coverage" – common law principles of waiver do not apply.

## III. REMEDY FOR PARITY ACT VIOLATION

The Court has found that Empire's blanket exclusion for residential treatment services violates the Parity Act. The Court has also found that Empire has not waived its arguments regarding the Plan's pre-certification requirement and exclusion for out-of-network inpatient mental health care.

Neither side has briefed the issue of what would be an appropriate remedy in light of these findings. As discussed above, non-compliance with the pre-certification requirement would not justify a blanket denial of benefits. Moreover, application of Empire's exclusion of out-of-network inpatient mental health care is problematic here, given that the Plan unlawfully excluded from coverage all residential treatment services, meaning that there were no "in-network" residential treatment centers that Plaintiff could have turned to for C.M.'s care.

Given these circumstances, the Court will direct the parties to submit supplemental briefing concerning an appropriate remedy in light of the Court's rulings.

40

The Court will, however, address Plaintiff's "Second Claim for Relief," which seeks equitable relief pursuant to 29 U.S.C. § 1132(a)(3). (See Cmplt. (Dkt. No. 1) ¶ 59; Pltf. Opp. Br. (Dkt. No. 67)) In his Second Claim for Relief, Plaintiff seeks (1) "[r]estitution of all past benefits due to Plaintiff, plus prejudgment and post-judgment interest"; and (2) "[a] mandatory injunction requiring [Empire] to immediately qualify Plaintiff for medical benefits due and owing under the Plan." (Cmplt. (Dkt. No. 1) ¶ 59)

Empire contends that it is entitled to summary judgment on Plaintiff's "Second Claim for Relief," because it is duplicative of the monetary relief Plaintiff seeks in his "First Claim for Relief." (See Def. Br. (Dkt. No. 59) at 21, 23) Plaintiff counters that he is entitled to plead claims in the alternative, and that should this Court "not find entirely in Plaintiff's favor on the benefits claim, equitable relief may be necessary to fashion an adequate remedy." (Pltf. Opp. Br. (Dkt. No. 67) at 11-13)

"Section 502(a)(3) of ERISA allows a participant or beneficiary under an ERISA plan to assert a civil action 'to obtain other appropriate equitable relief' that would otherwise be unavailable under section 502." Elizabeth W. v. Empire Healthchoice Assurance, Inc., No. 15 Civ. 5250 (CM), 2016 WL 5115496, at *17 (S.D.N.Y. Sept. 15, 2016) (quoting 29 U.S.C. § 1132(a)(3)), aff'd, 709 F. App'x 724 (2d Cir. 2017). "The equitable relief available under § 502(a)(3) consists of those remedies 'that were typically available in equity.'" Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 103 (2d Cir. 2005) (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210 (2002)).

"[I]njunctive relief is generally appropriate only when there is an inadequate remedy at law and irreparable harm will result if the relief is not granted." Id. Here, Plaintiff "cannot satisfy the conditions required for injunctive relief," because any harm "can be

compensated by money damages," and he can "pursue[] an alternative and effective remedy under § 502(a)(1)(B) of ERISA to recover the value of benefits wrongly denied." See id. Indeed, Plaintiff's request for an injunction requiring Empire "to immediately qualify Plaintiff for medical benefits due and owing under the Plan" is essentially compensatory in nature. (See Cmplt. (Dkt. No. 1) ¶ 59(b)) Accordingly, Plaintiff's request for injunctive relief does not fall within the parameters of 29 U.S.C. § 1132(a)(3). See Empire W, 2016 WL 5115496, at *17 (dismissing claim for injunctive relief under Section 502(a)(3) because plaintiff's request that Empire reconsider past claim decisions or entertain further evidence "essentially amounts to no more than a request for the Court to order Empire to reconsider Plaintiff's claim for benefits"); S.M. v. Oxford Health Plans (N.Y.), Inc., 94 F. Supp. 3d 481, 512 (S.D.N.Y. 2015) ("Plaintiff cannot satisfy the conditions required for injunctive relief as any harm to her can be compensated by money damages that would allow her to recover the value of benefits wrongly denied."), aff'd, 644 F. App'x 81 (2d Cir. 2016).

Similarly, Plaintiff's request for "[r]estitution of all past benefits due to Plaintiff" is patently duplicative of Plaintiff's claim for benefits in his First Claim for Relief. (See Cmplt. (Dkt. No. 1) ¶ 59(a)) This Court "decline[s] th[e] invitation to perceive equitable clothing where the requested relief is nakedly contractual." See Nechis, 421 F.3d at 103-04 (rejecting Plaintiff's claim for restitution under Section 502(a)(3)); Kawski v. Johnson & Johnson, No. 04 Civ. 6208 (CJS), 2005 WL 3555517, at *5-6 (W.D.N.Y. Dec. 19, 2005) (dismissing Plaintiff's claim pursuant to 29 U.S.C. § 1132(a)(3) because Plaintiff's request for "restitution [of] the sums due and owing to plaintiffs within defendants' possession" was "not [a] proper request[] for 'equitable' relief, but instead . . . [a] request[] for money damages.").

42

Accordingly, Defendant's motion for summary judgment on Plaintiff's Second Claim for Relief will be granted.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted to the extent that the Court finds that the Plan's provision excluding coverage for residential treatment services violates the Parity Act. Defendant's motion for summary judgment is granted as to the Complaint's Second Claim for Relief, but is otherwise denied.

The Court reserves decision as to the appropriate remedy for Defendant's statutory violation, pending additional briefing. Plaintiff's submission on this point is due on April 9, 2018. Defendant's submission is due on April 16, 2018. The Court will conduct a conference in this matter on April 20, 2018, at 10:00 a.m. in Courtroom 705, U.S. Courthouse, 40 Foley Square, New York, New York. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 56, 57).

Dated: New York, New York
March 30, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge